**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

TRUSTMARK INSURANCE COMPANY
and TRUSTMARK LIFE INSURANCE
COMPANY,

      Plaintiffs,

    v.

HARRINGTON BENEFIT SERVICES, INC.
D/B/A FISERV HEALTH - KANSAS,
UNITED MEDICAL RESOURCES, INC., and
UNITEDHEALTHCARE, INC.,

      Defendants.

Case No.

## COMPLAINT AND JURY DEMAND

Plaintiffs, Trustmark Insurance Company and Trustmark Life Insurance Company (together "Trustmark"), for their Complaint against Defendants Harrington Benefit Services, Inc., ("Harrington"), United Medical Resources, Inc. ("UMR"), and UnitedHealthcare, Inc. ("UnitedHealthcare"), allege the following:

### Nature of the Action

1.      This action arises from Defendants' breaches of an Administrative Agreement (described below), breaches of fiduciary duty, inducement to breach fiduciary duty, fraud, tortious interference with contract, and equitable estoppel all in connection with Defendant Harrington's provision of services for Trustmark and its insureds on a block of group life, health and disability insurance business.  For approximately twenty years, Defendant Harrington and Trustmark had a mutually beneficial business relationship.  This business relationship changed for the worst in conjunction with the acquisition of Defendant Harrington by Defendant

UnitedHealthcare in January 2008.   As described in detail below, acting at the direction of Defendants UMR and UnitedHealthcare, Defendant Harrington has breached the Administrative Agreement and its fiduciary duties to Trustmark in multiple ways by, among other things, failing to accurately and promptly process and adjudicate claims, failing to alert Trustmark that Defendant Harrington had ceased to accurately and promptly process and adjudicate claims, and failing to provide sufficient staff and reporting to ensure that claims were accurately and promptly processed and adjudicated.   These multiple failures by Defendants have caused Trustmark more than $6 million in losses known to Trustmark at this time.

### Parties

2.       Plaintiffs Trustmark Insurance Company and Trustmark Life Insurance Company ("Trustmark") are Illinois insurance corporations with their principal place of business located at 400 North Field Drive, Lake Forest, Illinois, 60045.   Trustmark is a 96-year-old company which serves employer and affinity groups, brokers, and individuals by providing a variety of life and health insurance products as well as benefit administration services.   Trustmark offers its customers life, medical, dental, disability, critical illness, and accident insurance.   Trustmark receives "A" category ratings from both A.M. Best and Fitch Ratings.

3.       Defendant Harrington Benefit Services, Inc. d/b/a Fiserv Health – Kansas is a Delaware corporation with its principal place of business at 300 West Douglas Avenue, Suite 800, Wichita, Kansas, 67202.   Defendant Harrington is a subsidiary of United Medical Resources, Inc.

4.       Defendant United Medical Resources, Inc. ("UMR") is an Ohio corporation with its principal place of business at 5151 Pfeiffer Road, Cincinnati, Ohio, 45242.   Defendant UMR is a subsidiary of Defendant UnitedHealthcare, Inc.

5.      Defendant UnitedHealthcare, Inc. ("UnitedHealthcare") is a Delaware corporation with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343.

### Jurisdiction And Venue

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      This Court has personal jurisdiction over each of the Defendants.  Among other things, Defendant Harrington has traveled to Illinois on multiple occasions to meet with Trustmark regarding its relationship with Trustmark under the Administrative Agreement. Defendants UMR and UnitedHealthcare have also traveled to Trustmark's headquarters in Lake Forest, Illinois to discuss the Administrative Agreement and Defendant Harrington's failures thereunder.  For example, on July 28, 2009, Jay Anliker, the President and Chief Executive Officer of Defendant UMR, Kimberly Hiatt, Associate General Counsel for Defendant UnitedHealthcare, Larry Schmidt, Vice President of Operations for Defendant Harrington, and Phil Buttress, the Senior Vice President of Operations for Defendant Harrington, traveled to Lake Forest, Illinois to meet with Trustmark to discuss Defendant Harrington's breaches of the Administrative Agreement that give rise to this action.  Furthermore, upon information and belief, this Court has general personal jurisdiction over Defendants UMR and UnitedHealthcare based upon Defendants' systematic and continuous activities and contacts within the State of Illinois.  Furthermore, the parties have agreed that Illinois law shall govern the interpretation of the Administrative Agreement.

8.      Venue in this district is proper pursuant to 28 U.S.C. § 1391(a)(2) and (3) in that a substantial part of the events or omissions giving rise to the claim occurred in this district and, as described above, the Defendants are subject to personal jurisdiction in this district.

### Statement of Facts

**A.      The Administrative Agreement Between Trustmark and Defendant Harrington.**

9.      For approximately twenty years and most recently, pursuant to an Administrative Agreement, Trustmark has been doing business with Defendant Harrington and its predecessors in connection with a block of medical, dental, disability, accidental death and dismemberment and life insurance policies issued by Trustmark on a group basis ("Harrington Block" or "Block").   Defendant Harrington sells Trustmark insurance to new groups, issues premium billings, collects premiums, processes claims, presents renewal proposals, handles claim appeals and complaints, implements benefit changes to the insurance policies issued to the groups, assists the groups with benefit changes to manage the groups' premium costs, and generally maintains the customer service relationship with all of the groups and the individuals in those groups that comprise the Harrington Block.   Trustmark pays Defendant Harrington a fee for these services. Trustmark provides the insurance policies for Defendant Harrington to market to the Block, provides Defendant Harrington with the funds to pay claims and provides underwriting services to the Block which includes establishing the premium rates that Defendant Harrington bills the insureds.   The relationship between Trustmark and Defendant Harrington is memorialized in a written contract entitled "Administrative Agreement."   The Administrative Agreement, with Amendments, is attached hereto as Exhibit A.

10.      Defendant Harrington is an agent of Trustmark with respect to Trustmark's relationship with its policyholders.   Based on their relationships and duties, Trustmark has

reposed special trust and confidence in Defendant Harrington and Defendant Harrington owes Trustmark and its insureds fiduciary duties of, among others, care, candor, loyalty, and good faith.

11.     Trustmark relied on data provided by Defendant Harrington to establish adequate premiums for the Harrington Block.   Specifically, Trustmark would use paid claim figures regularly supplied by Defendant Harrington in the process of estimating its total claim cost for the Harrington Block.   Trustmark relied on the pattern of Defendant Harrington's claims paying to develop what are called "completion factors" (data developed based on historical claims paying patterns to establish a reliable predictor of future claims paying patterns) to estimate reserves.   These estimates of reserves, coupled with paid claims, are then used to estimate the total claim cost for the Block, which ultimately is used as a critical data point in establishing premium rates for the Harrington Block.   If Defendant Harrington ceased paying claims on a timely basis, it was critical to Trustmark that Defendant Harrington promptly advise Trustmark of this fact as well as the extent of the change in Defendant Harrington's claim payment pattern so that Trustmark could change the completion factors it would use to establish adequate premiums for policy renewals for which a renewal offer had not yet been delivered by Trustmark.   Defendant Harrington knew that Trustmark relied on the data provided by Defendant Harrington to establish adequate premiums for the Harrington Block.   Enter Defendant UnitedHealthcare.

**B.     Defendant UnitedHealthcare Acquires Defendant Harrington.**

12.     In January 2008, Defendant UnitedHealthcare, through its subsidiary, Defendant UMR, acquired Defendant Harrington.   Because of Defendant UnitedHealthcare's size and poor reputation in the health insurance industry, Trustmark sought assurances from Defendant

UnitedHealthcare that it would maintain Defendant Harrington's relationship with Trustmark and not terminate it.  To address Trustmark's concerns, in February 2008, Ed Lagerstrom, Senior Vice President of Strategic Development for Defendant UnitedHealthcare, and Jim Petrich, President of Defendant Harrington (Wichita), offered to and did travel to Trustmark's headquarters in Lake Forest, Illinois to meet with Trustmark.  At that meeting, both Messrs. Lagerstrom and Petrich affirmatively represented to Trustmark that Defendants UnitedHealthcare and Harrington would continue the business relationship between Defendant Harrington and Trustmark without disruption, Defendant Harrington would continue to provide superior service to Trustmark and its insureds, and nothing would change in the parties' relationship to Trustmark's detriment.  Trustmark relied on these affirmative representations from Defendants UnitedHealthcare and Harrington.

**C.     Defendant Harrington Fails to Meet its Contractual and Fiduciary Obligations.**

13.     Unbeknownst to Trustmark, beginning in late 2007 and continuing through a date not yet known, despite its obligations under the Administrative Agreement to do so, Defendant Harrington ceased to process claims accurately and promptly on a consistent basis.  Defendant Harrington experienced severe staffing shortages that were driven, in part, by Defendant UMR's acquisition of Defendant Harrington.  These staffing shortages reached crisis levels after the acquisition in January 2008 and continued due to, among other things, changes in Defendant Harrington's employee benefit plans (causing employees to leave Defendant Harrington for employment with better benefits), hiring freezes, and/or budgetary restrictions imposed on Defendant Harrington by Defendants UMR and UnitedHealthcare.

14.     Defendant Harrington knew or recklessly disregarded the fact that Trustmark relied upon Defendant Harrington to promptly process claims and to supply Trustmark with

timely and accurate data relating to claim payments. Trustmark was unaware of the change in Defendant Harrington's claim payment pattern. Moreover, Defendant Harrington knew or recklessly disregarded the fact that its failure to alert Trustmark that it was no longer paying claims promptly would preclude Trustmark from being able to establish adequate premium rates and, consequently, would cause Trustmark to incur significant losses.

15.     As a consequence of Defendant Harrington's failure to process claims promptly, a backlog of unprocessed claims grew to what Trustmark now knows to be an unprecedented and unacceptable level. Defendant Harrington failed to promptly report to Trustmark on the growth and aging of this backlog as well as its size and severity. Further, even when Defendant Harrington apprised Trustmark of the existence of a backlog, Defendant Harrington did not provide Trustmark with accurate information as to the size and severity of the backlog so that Trustmark could attempt to take remedial steps. Moreover, after providing Trustmark with vague and inaccurate information regarding the backlog, Defendant Harrington then compounded its wrongdoing by repeatedly reassuring Trustmark that the backlog was being reduced to normal or close to normal levels when, in fact, that was not the case. Defendant Harrington also failed to take appropriate steps to reduce the claim backlog down to historical levels. And, Defendant Harrington failed to timely hire and train adequate staff, which resulted in the backlog significantly increasing over time.

16.     Further, although not known to Trustmark at the time, in violation of state prompt payment acts, Defendant Harrington failed to pay claims within prescribed statutory time periods. Defendant Harrington's management further instructed claims adjusters to pay claims without paying interest as required by law on those claims paid beyond the period of time

prescribed by state prompt payment acts. Defendant Harrington's practices violated the Kansas Unfair Trade Practices Act, thus exposing Trustmark to claims, fines, and other sanctions.

17.     Defendant Harrington's mismanagement of the claims has caused the number of market conduct complaints (complaints reported to insurance authorities by insureds and providers) received on the Block to increase dramatically, especially in the State of Kansas, resulting in a special market conduct examination[1] of Trustmark by the Kansas Department of Insurance, which examination, together with the numerous market conduct complaints received, exposes Trustmark to potential fines and other sanctions.

18.     In addition, Defendant Harrington has, among other breaches of the Administrative Agreement: (a) failed to properly code co-pays and deductibles; (b) lost provider discounts due to late claim payments; (c) made many duplicate payments; (d) paid claims that were not covered under the policies; (e) paid claims of individuals who were not covered under the policies; (f) issued insurance certificates that are in violation of state law; (g) arranged for Defendant UMR to adjudicate claims without Trustmark's prior written approval; and (h) caused Trustmark to lose sales in 2008 and 2009 as brokers, aware of Defendant Harrington's service failures, became unwilling to place business with Defendant Harrington, all to Trustmark's financial detriment.

**D.     Defendants Have Admitted Breaches of the Administrative Agreement.**

19.     At Trustmark's request, on July 28, 2009, Jay Anliker, the President and Chief Executive Officer of Defendant UMR, Kimberly Hiatt, Associate General Counsel for Defendant UnitedHealthcare, Larry Schmidt, Vice President of Operations for Defendant Harrington, and Phil Buttress, the Senior Vice President of Operations for Defendant Harrington, traveled to

---

[1]   A special market conduct examination is a nonroutine examination, usually the result of an increase in market conduct complaints, of an insurance company conducted by a state Department of Insurance to evaluate whether the company is in compliance with state laws with respect to rating, underwriting, and claim practices.

Lake Forest, Illinois, to discuss the serious deficiencies in Harrington's service and the harm caused to Trustmark and its insureds.  During this meeting, senior management of Defendant UnitedHealthcare, Defendant UMR, and Defendant Harrington assured Trustmark that they would cooperate to resolve the ongoing breaches of the Administrative Agreement.  At that meeting, Jay Anliker acknowledged Defendants UnitedHealthcare and UMR's awareness of the staffing crisis, that Defendants UnitedHealthcare and UMR knew that there was insufficient staff to properly administer the claims, and that the failure to hire additional claim employees was caused by budgetary constraints imposed by Defendants UMR and UnitedHealthcare. Furthermore, during a telephone call with Trustmark shortly before the July 28, 2009 meeting, Jeff Mills, President of Defendant Harrington, acknowledged Defendant Harrington's breaches of the Administrative Agreement, stating "we know we really screwed up."

**E.      Trustmark's Demand Letter and Defendants Harrington, UMR, and UnitedHealthcare's Responses.**

20.      On August 21, 2009, Trustmark sent a letter to the Defendants, detailing some of Defendant Harrington's ongoing breaches and the damages those breaches have caused and continue to cause Trustmark.  The August 21, 2009 letter is attached hereto as Exhibit B.

21.      On August 28, 2009, counsel for Defendants responded to Trustmark's letter denying that Trustmark had been damaged but agreeing to "work cooperatively to amicably resolve any issues."  The August 28, 2009 letter is attached hereto as Exhibit C.

22.      On October 2, 2009, counsel for Defendants further responded to Trustmark's August 21, 2009 letter, admitting that the "claims inventory did exceed normal levels" and that Defendant Harrington was responsible for paying the interest due insureds or providers as a result of Defendant Harrington's failures to comply with the prompt payment acts, but denying

responsibility for Trustmark's other claimed damages.   The October 2, 2009 letter is attached hereto as Exhibit D.

**F.**  **Despite Their Promises to Cooperate and In Spite of Their Contractual Obligations, Defendants Harrington and UnitedHealthcare Have Refused to Provide Claim Payment Information Requested by Trustmark.**

23.     Despite their representations that they would cooperate with Trustmark, and in violation of the Administrative Agreement, Defendant Harrington has refused to provide Trustmark with claims payment documentation relating to the location where claims were adjudicated.  Defendants first claimed that such information could not be provided based on privacy concerns.   When Trustmark demonstrated the absurdity of Defendant's assertion, Defendants then claimed that they would not provide any information to Trustmark that Trustmark might use against them.  Trustmark then asked Kimberly Hiatt, Associate General Counsel for Defendant UnitedHealthcare, to authorize Defendant Harrington to release the requested claim information.  Ms. Hiatt confirmed that Defendant UnitedHealthcare would not permit Defendant Harrington to provide the requested information.  Trustmark's emails, dated September 11 and 15, 2009, confirming Defendants Harrington and UnitedHealthcare's refusal to provide such claims payment information to Trustmark in violation of the Administrative Agreement are attached as Exhibit E.

### Count I:  Breach of the Administrative Agreement Against Defendant Harrington

24.     Trustmark repeats, realleges, and incorporates all allegations contained in paragraphs 1 through 23 as if fully restated here.

25.     The Administrative Agreement is a valid and binding contract.

26.     The most recent Administrative Agreement between Trustmark and Defendant Harrington's predecessor, Fiserv Health - Kansas, was effective June 1, 2003, with First and

Second Amendments to the Administrative Agreement effective June 1, 2003 and September 1,

2005, respectively ("Administrative Agreement").

    27.     The Administrative Agreement expressly provides, among other things:

    a.  "Administrator [Harrington] shall perform all acts included herein at its own expense and ***in the best interest of Company*** [Trustmark], subject to all terms of Contract(s) and Guidelines provided by Company." (Ex. A at ¶ II.A.1.) (Emphasis added.)

    b.  "Administrator [Harrington] shall indemnify and hold Company [Trustmark] harmless from all losses, costs, claims, demands, damages, and attorney's fees arising out of or caused by any act or omission of the Administrator [Harrington] or its employees, representatives, or agents acting alone or in concert with others." (Ex. A at ¶ VI.B.)

    c.  "The Administrator [Harrington] shall assume liability for any loss as a result of negligence, willful default, dishonesty, fraud, or embezzlement by Administrator [Harrington], its agents, employees or officers, . . . (Ex. A at ¶ II.B.4.)

    d.  "Administrator [Harrington] shall comply with all applicable Federal and state laws and regulations in each state in which it functions as Administrator [Harrington] on behalf of Company [Trustmark].  Further, Administrator [Harrington] shall have in place a Quality Assurance program monitoring timeliness and accuracy of all administrative functions.  Administrator [Harrington] shall provide written guidelines to Company [Trustmark] concerning audit procedures, goals, and results. Administrator [Harrington] is required to follow and meet its procedures and goals respectively and must immediately inform Company [Trustmark] in writing when goals or procedures are not met and must include a written plan to remedy the failure of performance. Administrator [Harrington] shall report, in a format approved by Company [Trustmark], monthly results of the Quality Assurance program."  (Ex. A at ¶ II.B.1.)

    e.  "Administrator [Harrington] shall maintain and make available to Company [Trustmark], complete books and records of all transactions on behalf of Company [Trustmark]. . . .  All records concerning premium, claims, underwriting, and general business of administration shall be maintained in a manner approved by the Company [Trustmark] and will be surrendered to Company [Trustmark] at Administrator's [Harrington's] expense upon Company's [Trustmark's] request."  (Ex. A at ¶ II.A.2.)

    f.  "Company [Trustmark] shall own the records and data generated by Administrator [Harrington] pertaining to the services rendered for

Company [Trustmark].  Administrator [Harrington] shall promptly provide any and all records and data to Company [Trustmark] upon request at Administrator's [Harrington's] expense." (Ex. A at ¶ II.A.3.)

g.  Administrator [Harrington] shall not subcontract or otherwise arrange with any other party to perform on its behalf services indicated without the Company's [Trustmark's] prior written consent. (Ex. A at ¶ V.A.)

28.     Trustmark has performed all obligations on its part to be performed under the Administrative Agreement.

29.     Defendant Harrington has breached Paragraph II.A.1 of the Administrative Agreement by failing to act "in the best interest" of Trustmark and other provisions of the Administrative Agreement in multiple ways, including, among others:  (a) failing to provide adequate staffing to properly and timely process claims; (b) failing to accurately and timely adjudicate claims; (c) instructing claims adjusters to pay claims without paying statutorily mandated interest in violation of, among other laws, the Kansas Unfair Trade Practices Act; (d) allowing claims inventory to increase and to age beyond acceptable levels; (e) failing to promptly alert Trustmark of the growing backlogged claims inventory; (f) failing to report to Trustmark the actual size and severity of the backlogged claims inventory; (g) providing inaccurate and insufficient information to Trustmark relating to the backlog; (h) misrepresenting that the backlog was reduced to normal or close to normal levels; (i) refusing to provide Trustmark with claims payment information; (j) failing to properly code co-pays and deductibles; (k) losing provider discounts due to late claim payments; (l) making many duplicate payments; (m) paying claims that were not covered under the policies; (n) paying claims of individuals who were not covered under the policies; (o) issuing insurance certificates that are in violation of state law; and (p) failing to obtain prior written approval from Trustmark prior to arranging for Defendant UMR to perform Harrington's services.

30.     As a direct and proximate result of Defendant Harrington's breaches, Trustmark has been damaged, among other ways, as follows:  (a) precluding Trustmark from properly establishing premium rates for the Harrington Block; (b) losing sales volume in 2008 and 2009 as brokers became aware of Defendant Harrington's service failures and became unwilling to place business with Defendant Harrington; (c) injuring Trustmark's reputation; (d) exposing Trustmark to potential fines and other sanctions; and (e) improperly handling claims by, among others, failing to properly code co-pays and deductibles, losing provider discounts due to late claim payments, making many duplicate payments, paying claims that were not covered under the policies, and paying claims of individuals who were not covered under the policies, resulting in additional financial losses for Trustmark.

WHEREFORE, Plaintiff Trustmark prays that this Court enter judgment in its favor and against Defendant Harrington for compensatory damages in an amount to be determined at trial, including payment of interest due to failure to comply with state prompt payment acts, plus prejudgment interest, expenses including attorneys' fees, and all other indemnifiable present and future costs under Paragraph VI.B. of the Administrative Agreement, and such other and further relief as this Court deems just and appropriate under the circumstances.

### Count II:  Breach of Fiduciary Duty Against Defendant Harrington

31.     Trustmark repeats, realleges, and incorporates all allegations contained in paragraphs 1 through 30 as if fully restated here.

32.     Defendant Harrington serves as Trustmark's agent under the Administrative Agreement with regard to its insureds and is responsible for managing Trustmark's relationships with its insureds.  Defendant Harrington sells Trustmark insurance to new groups, issues premium billings, collects premiums, processes claims, presents renewal proposals, handles

claim appeals and complaints, implements benefit changes to the insurance policies issued to the groups, assists the groups with benefit changes to manage the groups' premium costs and generally maintains the customer service relationship with all of the groups and the individuals in those groups that comprise the Harrington Block.  Trustmark pays Defendant Harrington a fee for these services.  Trustmark provides the insurance policies for Defendant Harrington to market to the Block, provides Defendant Harrington with the funds to pay claims, and provides underwriting services to the Block which includes establishing the premium rates that Defendant Harrington bills the insureds.  Based on these relationships and duties, Trustmark has reposed special trust and confidence in Defendant Harrington, and Defendant Harrington owes Trustmark and its insureds fiduciary duties of, among others, care, candor, loyalty, and good faith.

33.     Defendant Harrington has breached its fiduciary duties in multiple ways, including, among others (a) failing to provide adequate staffing to properly and timely process claims; (b) failing to accurately and timely adjudicate claims; (c) instructing claims adjusters to pay claims without paying statutorily mandated interest in violation of, among other laws, the Kansas Unfair Trade Practices Act; (d) allowing claims inventory to increase and to age beyond acceptable levels; (e) failing to promptly alert Trustmark of the growing backlogged claims inventory; (f) failing to report to Trustmark the actual size and severity of the backlogged claims inventory; (g) providing inaccurate and insufficient information to Trustmark; (h) repeatedly misrepresenting that the backlog was reduced to normal or close to normal levels; (i) refusing to provide Trustmark with claims payment information; (j) failing to properly code co-pays and deductibles; (k) losing provider discounts due to late claim payments; (l) making many duplicate payments; (m) paying claims that were not covered under the policies; (n) paying claims of individuals who were not covered under the policies; (o) issuing insurance certificates that are in

violation of state law; and (p) failing to obtain prior written approval from Trustmark prior to arranging for Defendant UMR to perform Defendant Harrington's services.

34.     As a direct and proximate result of Defendant Harrington's breaches, Trustmark has been damaged, among other ways, as follows:  (a) precluding Trustmark from properly establishing premium rates for the Harrington Block; (b) losing sales volume in 2008 and 2009 as brokers became aware of Defendant Harrington's service failures and became unwilling to place business with Defendant Harrington; (c) injuring Trustmark's reputation; (d) exposing Trustmark to potential fines and other sanctions; and (e) improperly handling claims by, among others, failing to properly code co-pays and deductibles, losing provider discounts due to late claim payments, making many duplicate payments, paying claims that were not covered under the policies, and paying claims of individuals who were not covered under the policies, resulting in additional financial losses for Trustmark.

WHEREFORE, Plaintiff Trustmark prays that this Court enter judgment in its favor and against Defendant Harrington for compensatory and punitive damages in an amount to be determined at trial, plus prejudgment interest, expenses including attorneys' fees, and all other indemnifiable present and future costs under Paragraph VI.B. of the Administrative Agreement, and such other and further relief as this Court deems just and appropriate under the circumstances.

### Count III:  Inducement to Breach Fiduciary Duty Against Defendants UMR and UnitedHealthcare

35.     Trustmark repeats, realleges, and incorporates all allegations contained in paragraphs 1 through 34 as if fully restated here.

36.     Defendants UMR and UnitedHealthcare colluded with Defendant Harrington in committing breaches of Defendant Harrington's fiduciary duties to Trustmark and its insureds by

failing to put Trustmark and its insured's interests ahead of the interests of Defendants UMR and UnitedHealthcare.

37.     Defendants UMR and UnitedHealthcare induced and participated in Defendant Harrington's breaches of fiduciary duty to Trustmark and its insureds.  For example, Defendants UMR and UnitedHealthcare (a) mandated budgetary restrictions which resulted in Defendant Harrington not providing adequate staffing to properly and timely process claims which led to an unacceptable increase in claims inventory and (b) instructed Defendant Harrington to refuse to provide Trustmark with claims payment information in violation of the Administrative Agreement and Defendant Harrington's fiduciary duties.

38.     As parent companies of Defendant Harrington, Defendants UMR and UnitedHealthcare benefitted from Defendant Harrington's breach of its fiduciary duties to Trustmark and its insureds both financially (saving money by refusing to hire additional claim handling employees) and through refusing to produce information that could be used against Defendants Harrington, UMR, and UnitedHealthcare, even though such information was required to be provided to Trustmark under the Administrative Agreement.

39.     As a direct and proximate result of Defendants UMR and UnitedHealthcare's inducement of Defendant Harrington's breaches, Trustmark has been damaged in multiple ways, including, among others:  (a) precluding Trustmark from properly establishing premium rates for the Harrington Block; (b) losing sales volume in 2008 and 2009 as brokers became aware of Defendant Harrington's service failures and became unwilling to place business with Defendant Harrington; (c) injuring Trustmark's reputation; (d) exposing Trustmark to potential fines and other sanctions; and (e) improperly handling claims by, among others, failing to properly code co-pays and deductibles, losing provider discounts due to late claim payments, making many

duplicate payments, paying claims that were not covered under the policies, and paying claims of individuals who were not covered under the policies, resulting in additional financial losses for Trustmark.

WHEREFORE, Plaintiff, Trustmark, prays that this Court enter judgment in its favor and against Defendants UMR and UnitedHealthcare for compensatory and punitive damages in an amount to be determined at trial, plus prejudgment interest, expenses including attorneys' fees, and all other indemnifiable present and future costs under Paragraph VI.B. of the Administrative Agreement, and such other and further relief as this Court deems just and appropriate under the circumstances.

### Count IV:  Fraud Against Defendants Harrington and UnitedHealthcare

40.      Trustmark repeats, realleges, and incorporates all allegations contained in paragraphs 1 through 39 as if fully restated here.

41.      Unbeknownst to Trustmark, beginning in late 2007 and continuing through a date not yet known, despite its duties under the Administrative Agreement to do so, Defendant Harrington ceased to process claims accurately and promptly on a consistent basis.  Defendant Harrington experienced severe staffing shortages that were driven, in part, by the acquisition of Defendant Harrington by Defendant UMR.   These staffing shortages reached crisis levels following Defendant UMR's acquisition of Defendant Harrington in January 2008 and continued due to, among other things, changes in Defendant Harrington's employee benefit plans (causing employees to leave Defendant Harrington for employment with better benefits), hiring freezes, and/or budgetary restrictions imposed on Defendant Harrington by Defendants UMR and UnitedHealthcare.

42.     Defendant Harrington knew or recklessly disregarded the fact that Trustmark relied upon Defendant Harrington to promptly process claims and to supply Trustmark with timely and accurate data relating to claim payments.  Trustmark was unaware of the change in Defendant Harrington's claim payment pattern.  Moreover, Defendant Harrington knew or recklessly disregarded the fact that its failure to alert Trustmark that it was no longer paying claims promptly would preclude Trustmark from being able to accurately establishing premium rates and, consequently, would cause Trustmark to incur significant losses.

43.     At the July 28, 2009 meeting with Trustmark, Jay Anliker, the President and Chief Executive Officer of Defendant UMR, admitted Defendants UnitedHealthcare and UMR's awareness of the staffing crisis, that Defendants UnitedHealthcare and UMR knew that there was insufficient staff to properly administer the claims, and that the failure to hire additional claim employees was caused by budgetary constraints imposed by Defendants UMR and UnitedHealthcare.

44.     As a consequence of Defendant Harrington's failure to process claims promptly, a backlog of unprocessed claims grew to what Trustmark now knows to be an unprecedented and unacceptable level.  Defendant Harrington failed to fulfill its duties under the Administrative Agreement and its fiduciary duties to Trustmark by concealing such material facts from Trustmark.  Defendant Harrington failed to promptly report to Trustmark on the growth and aging of this backlog as well as its size and severity.  Further, even when Defendant Harrington apprised Trustmark of the existence of a backlog, Defendant Harrington did not provide Trustmark with accurate information as to the size and severity of the backlog so that Trustmark could attempt to take remedial steps.  Moreover, after providing Trustmark with vague and inaccurate information regarding the backlog, Defendant Harrington then compounded its

wrongdoing by repeatedly reassuring Trustmark that the backlog was being reduced to normal or close to normal levels when, in fact, that was not the case and Defendant Harrington knew that was not the case or recklessly disregarded that that was not the case.  Defendant Harrington also failed to take appropriate steps to reduce the claim backlog down to historical levels.  And, Defendant Harrington failed to timely hire and train adequate staff, which resulted in the backlog significantly increasing over time.

45.     Defendant Harrington's failures to, among others, promptly process claims and to supply Trustmark with timely and accurate data relating to claim payments, promptly report to Trustmark on the growth and aging of this backlog as well as its size and severity, and its misrepresentations that the backlog was being reduced to normal or close to normal levels, are material facts and not mere opinions.

46.     Defendant Harrington intended to induce Trustmark's reliance on it to, among others, promptly process claims, supply Trustmark with timely and accurate data relating to claim payments, and promptly report to Trustmark on the growth and aging of this backlog as well as its size and severity.  Furthermore, Defendant Harrington made misrepresentations to Trustmark that the backlog was being reduced to normal or close to normal levels for the purpose of inducing Trustmark's reliance.

47.     Trustmark's reasonable reliance on Defendant Harrington to, among others, promptly process claims, supply Trustmark with timely and accurate data relating to claim payments, promptly report to Trustmark on the growth and aging of this backlog as well as its size and severity, and on Defendant Harrington's misrepresentations that the backlog was being reduced to normal or close to normal levels has damaged Trustmark in an amount to be proven at trial, as alleged above.

48.      Additionally, in January 2008, when Defendant UnitedHealthcare, through its subsidiary, Defendant UMR, acquired Defendant Harrington.  In February 2008, Ed Lagerstrom, Senior Vice President of Strategic Development for Defendant UnitedHealthcare, and Jim Petrich, President of Defendant Harrington (Wichita), traveled to Trustmark's headquarters in Lake Forest, Illinois. At that meeting, both Messrs. Lagerstrom and Petrich affirmatively represented to Trustmark that Defendants UnitedHealthcare and Harrington would continue the business relationship between Defendant Harrington and Trustmark without disruption, Defendant Harrington would continue to provide superior service to Trustmark and its insureds, and nothing would change in the parties' relationship to Trustmark's detriment.  Trustmark reasonably relied on these affirmative representations from Defendants Harrington and UnitedHealthcare.

49.      Messrs. Lagerstrom and Petrich did not inform Trustmark that, among other things, changes in Defendant Harrington's employee benefit plans (causing employees to leave Defendant Harrington for employment with better benefits), hiring freezes and/or budgetary restrictions imposed by Defendants UMR and UnitedHealthcare were already negatively affecting and were likely to increasingly negatively affect the level of service that Trustmark would receive after the acquisition.

50.      Messrs. Lagerstrom and Petrich's affirmative representations, as senior management of Defendants UnitedHealthcare and Harrington, were material and were not mere opinions.

51.      Messrs. Lagerstrom and Petrich's statements regarding Defendants UnitedHealthcare and Harrington's commitments to Trustmark were untrue, as Defendants Harrington and UnitedHealthcare did not intend to fulfill those commitments.

52.     Because Messrs. Lagerstrom and Petrich were aware of the staffing crisis caused by changes in Defendant Harrington's employee benefit plans (causing employees to leave Defendant Harrington for employment with better benefits), hiring freezes and/or budgetary restrictions imposed by Defendants UMR and UnitedHealthcare which were negatively affecting and were likely to increasingly negatively affect the level of service that Trustmark would receive after the acquisition, at the time of their statements, Messrs. Lagerstrom and Petrich either knew their statements were untrue or made the statements in reckless disregard of the fact they were untrue.

53.     Trustmark reasonably relied on the commitment of these senior members of the Defendants UnitedHealthcare and Harrington to its detriment.

54.     Messrs. Lagerstrom and Petrich's untrue statements that Defendants UnitedHealthcare and Harrington would continue the business relationship between Defendant Harrington and Trustmark without disruption, Defendant Harrington would continue to provide superior service to Trustmark and its insureds, and nothing would change in the parties' relationship to Trustmark's detriment were made for the purpose of inducing reliance by Trustmark.

55.     Trustmark's reasonable reliance on Messrs. Lagerstrom and Petrich's statements regarding Defendants UnitedHealthcare and Harrington's commitments to Trustmark led to Trustmark's injuries, as alleged above.

WHEREFORE, Plaintiff, Trustmark, prays that this Court enter judgment in its favor and against Defendants Harrington and UnitedHealthcare for compensatory and punitive damages in an amount to be determined at trial, plus prejudgment interest, expenses including attorneys' fees, and all other indemnifiable present and future costs under Paragraph VI.B. of the

Administrative Agreement, and such other and further relief as this Court deems just and appropriate under the circumstances.

### Count V:  Equitable Estoppel Against Defendants Harrington, UMR, and UnitedHealthcare

56.     Trustmark repeats, realleges, and incorporates all allegations contained in paragraphs 1 through 55 as if fully restated here.

57.     Unbeknownst to Trustmark, beginning in late 2007 and continuing through a date not yet known, despite its obligations under the Administrative Agreement to do so, Defendant Harrington ceased to process claims accurately and promptly on a consistent basis.  Defendant Harrington experienced severe staffing shortages that were driven, in part, by the acquisition of Defendant Harrington by Defendant UMR.   These staffing shortages reached crisis levels following Defendant UMR's acquisition of Defendant Harrington in January 2008 and continued due to, among other things, changes in Defendant Harrington's employee benefit plans (causing employees to leave Defendant Harrington for employment with better benefits), hiring freezes, and/or budgetary restrictions imposed on Defendant Harrington by Defendants UMR and UnitedHealthcare.

58.     Defendant Harrington knew that Trustmark relied upon Defendant Harrington to promptly process claims and to supply Trustmark with timely and accurate data relating to claim payments.  Moreover, Defendant Harrington knew that its failure to alert Trustmark that it was no longer paying claims promptly would preclude Trustmark from accurately establishing premium rates and, consequently, would cause Trustmark to incur significant losses as Trustmark was unaware of the change in Defendant Harrington's claim payment pattern and therefore unable to use the appropriate completion factors necessary for establishing appropriate premiums for the Block.

- 22 -

59.    At the July 28, 2009 meeting with Trustmark, Jay Anliker, the President and Chief Executive Officer of Defendant UMR, admitted Defendants UnitedHealthcare and UMR's awareness of the staffing crisis, that Defendants UnitedHealthcare and UMR knew that there was insufficient staff to properly administer the claims, and that the failure to hire additional claim employees was caused by budgetary constraints imposed by Defendants UMR and UnitedHealthcare.

60.    As a consequence of Defendant Harrington's failure to process claims promptly, a backlog of unprocessed claims grew to what Trustmark now knows to be an unprecedented and unacceptable level.  Defendant Harrington failed to promptly report to Trustmark on the growth and aging of this backlog as well as its size and severity.   Further, even when Defendant Harrington apprised Trustmark of the existence of a backlog, Defendant Harrington did not provide Trustmark with accurate information as to the size and severity of the backlog so that Trustmark could attempt to take remedial steps.   Moreover, after providing Trustmark with vague and inaccurate information regarding the backlog, Defendant Harrington then compounded its wrongdoing by repeatedly reassuring Trustmark that the backlog was being reduced to normal or close to normal levels when, in fact, that was not the case and Defendant Harrington knew that was not the case.   Defendant Harrington also failed to take appropriate steps to reduce the claim backlog down to historical levels.   And, Defendant Harrington failed to timely hire and train adequate staff, which resulted in the backlog significantly increasing over time.

61.    Defendant Harrington misrepresented to and concealed from Trustmark, among others, its failures promptly process claims and to supply Trustmark with timely and accurate data relating to claim payments, its failure to promptly report to Trustmark on the growth and

aging of this backlog as well as its size and severity, and that its statements that the backlog was being reduced to normal or close to normal levels were not, in fact, true.

62.     Trustmark was unaware that Defendant Harrington had misrepresented to and concealed from Trustmark, among others, its failures promptly process claims and to supply Trustmark with timely and accurate data relating to claim payments, its failure to promptly report to Trustmark on the growth and aging of this backlog as well as its size and severity, and that its statements that the backlog was being reduced to normal or close to normal levels were not, in fact, true.

63.     Defendant Harrington intended or reasonably expected Trustmark to rely and act upon the information Defendant Harrington was providing to Trustmark regarding its pattern of claims payment.

64.     Trustmark's good-faith reliance on Defendant Harrington to, among others, promptly process claims, supply Trustmark with timely and accurate data relating to claim payments, promptly report to Trustmark on the growth and aging of this backlog as well as its size and severity, and on Defendant Harrington's misrepresentations that the backlog was being reduced to normal or close to normal levels has damaged Trustmark in an amount to be proven at trial.

65.     Trustmark will be prejudiced if Defendant Harrington is permitted to deny the falsity of its concealment of these material facts regarding its claims payment pattern and its misrepresentations to Trustmark.

66.     Additionally, in January 2008, when Defendant UnitedHealthcare, through its subsidiary, Defendant UMR, acquired Defendant Harrington, Trustmark sought assurances from Defendant UnitedHealthcare, because of Defendant UnitedHealthcare's size and poor reputation

in the health insurance industry, that it would keep the relationship with Defendant Harrington in place as is and not terminate it. To address Trustmark's concerns, in February 2008, Ed Lagerstrom, Senior Vice President of Strategic Development for Defendant UnitedHealthcare, and Jim Petrich, President of Defendant Harrington (Wichita), offered to and did travel to Trustmark's headquarters in Lake Forest, Illinois. At that meeting, both Messrs. Lagerstrom and Petrich affirmatively represented to Trustmark that Defendants UnitedHealthcare and Harrington would continue the business relationship between Defendant Harrington and Trustmark without disruption, Defendant Harrington would continue to provide superior service to Trustmark and its insureds, and nothing would change in the parties' relationship to Trustmark's detriment. Trustmark, in good faith, relied on these affirmative representations from Defendants Harrington and UnitedHealthcare.

67.      Messrs. Lagerstrom and Petrich did not inform Trustmark that, among other things, changes in Defendant Harrington's employee benefit plans (causing employees to leave Defendant Harrington for employment with better benefits), hiring freezes and/or budgetary restrictions imposed by Defendants UMR and UnitedHealthcare were already negatively affecting and were likely to increasingly negatively affect the level of service that Trustmark would receive after the acquisition.

68.      Messrs. Lagerstrom and Petrich's statements, as senior management of Defendants UnitedHealthcare and Harrington, regarding Defendants UnitedHealthcare and Harrington's commitments to Trustmark Defendants UnitedHealthcare and Harrington would continue the business relationship between Defendant Harrington and Trustmark without disruption, Defendant Harrington would continue to provide superior service to Trustmark and

its insureds, and nothing would change in the parties' relationship to Trustmark's detriment were material.

69.     Messrs. Lagerstrom and Petrich's statements regarding Defendants UnitedHealthcare and Harrington's commitments to Trustmark were untrue.

70.     Because Messrs. Lagerstrom and Petrich were aware of the staffing crisis caused by changes in Defendant Harrington's employee benefit plans (causing employees to leave Defendant Harrington for employment with better benefits), hiring freezes and/or budgetary restrictions imposed by Defendants UMR and UnitedHealthcare which were negatively affecting and were likely to increasingly negatively affect the level of service that Trustmark would receive after the acquisition, at the time of their statements, Messrs. Lagerstrom and Petrich knew their statements were untrue.

71.     Trustmark did not know that Messrs. Lagerstrom and Petrich's statement were untrue.

72.     Trustmark relied on the commitment of these senior members of the Defendants UnitedHealthcare and Harrington to its detriment.

73.     Messrs. Lagerstrom and Petrich intended or reasonably expected Trustmark to rely and act upon their statements that Defendants UnitedHealthcare and Harrington would continue the business relationship between Defendant Harrington and Trustmark without disruption, Defendant Harrington would continue to provide superior service to Trustmark and its insureds, and nothing would change in the parties' relationship to Trustmark's detriment.

74.     Trustmark's reasonable reliance on Messrs. Lagerstrom and Petrich's statements regarding Defendants UnitedHealthcare and Harrington's commitments to Trustmark led to Trustmark's injuries.

75.      Trustmark will be prejudiced if Defendant Harrington is permitted to deny the falsity of its concealment of these material facts regarding its claims payment pattern and its misrepresentations to Trustmark.

WHEREFORE, Plaintiff, Trustmark, prays that this Court enter judgment in its favor and against Defendants Harrington, UMR, and UnitedHealthcare for compensatory and punitive damages in an amount to be determined at trial, plus prejudgment interest, expenses including attorneys' fees, and all other indemnifiable present and future costs under Paragraph VI.B. of the Administrative Agreement, and such other and further relief as this Court deems just and appropriate under the circumstances.

### Count VI:  Tortious Interference With Contract Against Defendant UnitedHealthcare

76.      Trustmark repeats, realleges, and incorporates all allegations contained in paragraphs 1 through 75 as if fully restated here.

77.      The Administrative Agreement is a valid and enforceable contract between Trustmark and Defendant Harrington.

78.      Defendant UnitedHealthcare, Defendant Harrington's parent company, is aware of the Administrative Agreement and Defendant UnitedHealthcare has participated in various meetings and discussions, including a meeting with Trustmark on July 28, 2009, pertaining to Trustmark's concerns regarding Defendant Harrington's breaches of the Administrative Agreement.  Trustmark's August 21, 2009 demand letter was addressed and delivered to Jay Anliker, President of Defendant UMR, as well as Jeff Mills, President of Defendant Harrington and Kimberly Hiatt, Associate General Counsel for Defendant UnitedHealthcare.  Additionally, Ms. Hiatt responded to Trustmark's demand letter by a letters dated August 28, 2009 and October 2, 2009.

79.     At the July 28, 2009 meeting with Trustmark, Mr. Anliker informed Trustmark that Phil Buttress of Defendant Harrington would be the liaison to Trustmark for addressing the numerous problems with Defendant Harrington's administration of the Block.

80.     In violation of the Administrative Agreement, when Trustmark requested that Defendant Harrington provide claims payment documentation relating to the location where claims were adjudicated, Mr. Buttress of Defendant Harrington informed Trustmark that it was refusing to provide Trustmark with such claims documentation because Defendant Harrington would not provide information to Trustmark that Trustmark might use against Defendants.

81.     Defendant UnitedHealthcare intentionally and unjustifiably induced Defendant Harrington to breach its Agreement with Trustmark.  When Trustmark further communicated with Kimberly Hiatt, Associate General Counsel for Defendant UnitedHealthcare, regarding obtaining the requested claim payment information, Ms. Hiatt confirmed that Defendant UnitedHealthcare would not permit Defendant Harrington to provide the requested information.

82.     Jeff Mills, Defendant Harrington's President, further confirmed to Trustmark that, based upon the refusal of Ms. Hiatt to allow Defendant Harrington to provide the requested documentation, Defendant Harrington was refusing to provide the requested documentation to Trustmark, in violation of the Administrative Agreement.

83.     Defendant Harrington's refusal to provide the documentation requested by Trustmark constitutes a breach of the Administrative Agreement's provisions which require Defendant Harrington to "maintain and make available to Company [Trustmark], complete books and records of all transactions on behalf of Company [Trustmark]" and to "surrender[] to Company [Trustmark] at Administrator's [Harrington's] expense upon Company's [Trustmark's] request" all information relating to claims. (Ex. A at ¶ II.A.2.) Further, under the Administrative

Agreement, Trustmark "shall own the records and data generated by Administrator [Harrington] pertaining to the services rendered for Company [Trustmark]" and Harrington "shall promptly provide any and all records and data to Company [Trustmark] upon request at Administrator's [Harrington's] expense." (Ex. A at ¶ II.A.3.)

84.     Defendant UnitedHealthcare's failure to permit Defendant Harrington to provide the requested information as required by the Administrative Agreement and its fiduciary duties has damaged Trustmark in an amount to be proven at trial.

WHEREFORE, Plaintiff, Trustmark, prays that this Court enter judgment in its favor and against Defendant UnitedHealthcare for compensatory and punitive damages in an amount to be determined at trial, plus prejudgment interest, expenses including attorneys' fees, and all other indemnifiable present and future costs under Paragraph VI.B. of the Administrative Agreement, and such other and further relief as this Court deems just and appropriate under the circumstances.

### Jury Demand

Trustmark demands a trial by jury of all issues triable by a jury under Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

TRUSTMARK INSURANCE COMPANY
AND TRUSTMARK LIFE INSURANCE
COMPANY


By: /s/    Kathryn C. Thomas
       One of their Attorneys

Joseph L. Fogel
Kathryn C. Thomas
Freeborn & Peters LLP
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606-6677
312.360.6000

Dated: October 29, 2009